Tania Linares Garcia (CA Bar No. 307980)
Jessica Zhang*
Claudia Valenzuela*
IMMIGRANT LEGAL DEFENSE
1301 Clay St., #70010
Oakland, CA 94612
Telephone: (510) 473-2989
tania@ild.org

*Attorneys for Plaintiff L.V.Q.*

*Pro hac vice applications forthcoming*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
## FRESNO DIVISION

| | |
|---|---|
| L.V.Q.,[1] | Case No. _____ |
| Plaintiff, | |
| v. | **COMPLAINT FOR DAMAGES** |
| THE GEO GROUP, INC., a Florida Corporation, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

---

[1] Plaintiff has filed a Motion to Proceed Under Pseudonym and for a Protective Order concurrently with this Complaint.

**INTRODUCTION**

1.      Plaintiff L.V.Q. has lived in the United States with his family since he arrived as a refugee from Vietnam in 1982 at the age of eight. He became a lawful permanent resident in 1983. Since he was a child, he has lived with a major neurocognitive disability, caused by a traumatic brain injury he suffered when he fell out of a tree. Because of his neurocognitive disability, L.V.Q. has low intellectual functioning, illiteracy, poor comprehension, and limited communication skills. He also is hard of hearing. Given his disabilities, L.V.Q. is particularly vulnerable to victimization and harm by others.

2.      In 2018, Immigration and Customs Enforcement (ICE) detained L.V.Q. following completion of a criminal sentence and began removal proceedings against him. For nearly four years, between January 2018 and August 2022, L.V.Q. endured civil immigration detention in ICE custody while he defended against his removal, seeking to retain his lawful permanent resident status through his U.S. citizen wife.

3.      ICE held L.V.Q. at the Mesa Verde ICE Processing Center (Mesa Verde) in Bakersfield, California for the entire time that it detained L.V.Q. Mesa Verde is owned and operated on behalf of ICE pursuant to a federal contract by Defendant The GEO Group, Inc. (GEO Group), a private corporation incorporated and headquartered in Florida. The contract between ICE and GEO Group, which includes operating a second facility in McFarland, California, is worth over 1.5 billion dollars over a 15-year period.[2] The contract also binds GEO Group to comply with federal immigration detention standards intended to ensure a safe and secure environment for noncitizens in ICE custody, including protections against sexual abuse pursuant to the Prison Rape Elimination Act (PREA) and requirements for disability accommodations pursuant to the Rehabilitation Act. Via its contract and its status as a jailer, GEO Group assumed a duty to care for and protect L.V.Q. at all times that he was detained at Mesa Verde in ICE custody.

---

[2] During the time that ICE held L.V.Q. at Mesa Verde, there were three contracts at issue. Between January 2015 and March 2019, ICE and the City of McFarland had an Intergovernmental Service Agreement (IGSA) to house individuals in ICE custody, and the City of McFarland contracted with GEO Group to carry out the IGSA. On March 5, 2019, ICE began contracting directly with GEO Group to continue operating Mesa Verde. On December 19, 2019, ICE entered into a new contract with GEO Group to continue operating Mesa Verde until December 19, 2034, with options for ICE to terminate the contract every five years, beginning on December 20, 2024. Under all of these contracts, GEO Group was required to comply with federal immigration detention standards in its operation of Mesa Verde. Thus, for ease of reference, this Complaint will refer to all of these contracts interchangeably.

4.      Despite GEO Group's obligations pursuant to its contract with ICE, during the time that ICE detained L.V.Q. at Mesa Verde, L.V.Q. endured repeated physical and sexual harassment and abuse. This pattern of harassment and abuse culminated in a sexual assault in June of 2022, as well as a violent rape only a handful of days later. Employees of GEO Group at Mesa Verde were aware of L.V.Q.'s vulnerabilities and the prior physical and sexual assaults and harassment that L.V.Q. endured while at Mesa Verde, and yet, failed to protect L.V.Q. and failed to abide by immigration detention standards as to his care. This failure by GEO Group employees at Mesa Verde to abide by the required standards and act in their duty to protect L.V.Q. caused L.V.Q. to suffer egregious harm that will impact his life forever.

**JURISDICTION AND VENUE**

5.      The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000.

6.      Plaintiff L.V.Q. is a resident of El Monte, California.

7.      Defendant The GEO Group, Inc. (GEO Group) is a private corporation incorporated in Florida and headquartered in Boca Raton, Florida.

8.      Venue is proper in this District under 28 U.S.C. § 1391 and 15 U.S.C. § 22, because a "substantial part of the events or omissions" on which the claim is based occurred in this District. Plaintiff L.V.Q.'s claims stem from torts and statutory violations that occurred at the Mesa Verde ICE Processing Facility (Mesa Verde) in Bakersfield, California. Mesa Verde is owned and operated by GEO Group.

**PARTIES**

9.      Plaintiff L.V.Q. has lived in the United States since 1982, when he entered with his family as a refugee from Vietnam at the age of eight. He became a lawful permanent resident in 1983. He has a Major Neurocognitive Disorder, caused by a traumatic brain injury he received when he was ten years old. At all times relevant to the facts alleged in this complaint, ICE detained L.V.Q. at Mesa Verde in Bakersfield, California.

10.     Defendant The GEO Group, Inc. is a for-profit private corporation. GEO Group owns and operates Mesa Verde pursuant to a contract with ICE, the federal agency tasked with arresting,

detaining, and removing noncitizens who are subject to removal from the United States. All GEO Group employees were acting within the scope of their employment at all times relevant to this Complaint.

**FACTS**

11.     Plaintiff L.V.Q. is a 50-year-old man who has lived in the United States since February 4, 1982, when he arrived with his family as a refugee from Vietnam at the age of eight. L.V.Q. became a lawful permanent resident in 1983. He has not left the United States since his arrival over 42 years ago.

12.     When L.V.Q. was about ten years old, he fell from a tree and hit his head, causing permanent traumatic brain damage. He has since been diagnosed with Major Neurocognitive Disorder.

13.     L.V.Q. has severe cognitive disabilities, which manifest in part in low intellectual functioning, illiteracy, poor comprehension, and limited communication skills. He has difficulty knowing the date, his home address, or his exact age. His intellectual and moral development is similar to that of a child, and he is severely limited in his ability to fully express how he is thinking and feeling. The severity of L.V.Q.'s cognitive disability is apparent to others even after a short interaction with him.

14.     L.V.Q. completed high school in California, attending special education classes.

15.     L.V.Q. has never lived independently and prior to his incarceration in 2011, he has always lived with his parents, who helped him with daily tasks.

16.     L.V.Q. is also hard of hearing and needs a hearing aid.

17.     In 2011, L.V.Q. was convicted under California Penal Code § 245(c), Assault on a Peace Officer. He entered into the California Department of Corrections and Rehabilitation (CDCR) custody on December 14, 2011, and ultimately served approximately seven years.

18.     While in CDCR custody, CDCR staff documented L.V.Q.'s disabilities, identified him as needing accommodations for communication and adaptive functioning, and adjusted his living conditions and programs accordingly.

19.     CDCR staff placed L.V.Q. in the "Developmentally Disabled Program" (DDP) at the "DD2 level of care." CDCR staff screened him for placement in the DDP on or around December 21, 2011, shortly after L.V.Q. entered CDCR custody. DD2 signifies that L.V.Q. needed occasional prompts to initiate and complete daily activities, and/or has victimization concerns, and thus, required housing in a designated building, wing, or unit that accounts for these characteristics. On January 6, 2012, an

Institutional Staff Recommendation Summary completed by CDCR staff noted that L.V.Q. was placed in the DDP at a DD2 level of care, and that "[e]ffective communication" with L.V.Q. required speaking "slowly using simple [E]nglish" and asking L.V.Q. to "paraphrase his understanding" of the conversation.

20.     CDCR implemented accommodations to assist with L.V.Q.'s comprehension needs. He received assistance with reading and completing CDCR forms. CDCR's accommodations also required staff to use simple language and one- or two-step instructions, with checks for comprehension when communicating with L.V.Q. Both L.V.Q.'s California Adaptive Support Evaluation and his Interdisciplinary Support Team (IDST), comprised of CDCR employees and psychologists, noted that L.V.Q. was to be monitored for undue influence from other inmates and that he was at risk of being unduly pressured, as well as that he was also at risk of losing his personal property to other inmates.

21.     CDCR also identified L.V.Q.'s hearing disability and designated him as "DNH," or an individual with a hearing disability who uses a hearing device to achieve effective communication. CDCR designated him as needing a hearing device or a hearing-impaired vest when he was not using the hearing device. CDCR also noted that staff needed to speak loudly and clearly to L.V.Q.

22.     L.V.Q.'s hearing disability, cognitive disability, and required accommodations were documented repeatedly in CDCR's records, including in a Release Note and a Patient Summary in L.V.Q.'s medical files.

23.     On or around January 11, 2018, Marco A. Follert, a Deportation Officer with Immigration and Customs Enforcement (ICE), a subagency of the Department of Homeland Security (DHS), interviewed L.V.Q. while L.V.Q. was in CDCR custody, at the California Substance Abuse Treatment Facility in Corcoran, California. Officer Follert documented that, during the interview, L.V.Q. informed Officer Follert of L.V.Q.'s need to always wear a hearing aid.

24.     Officer Follert also noted that L.V.Q.'s CDCR medical records had been added to his immigration file.

25.     On or around January 17, 2018, CDCR released L.V.Q. from its custody.

26. On or around January 18, 2018, ICE took L.V.Q. into its custody and initiated deportation proceedings in his case. Because of his criminal conviction, ICE detained L.V.Q. without the possibility for bond or release.

27. ICE transferred L.V.Q. to the Mesa Verde ICE Processing Center (Mesa Verde) in Bakersfield, California. Mesa Verde is a privately contracted facility owned and operated by Defendant The GEO Group, Inc., a for-profit corporation that has a contract with ICE to run and maintain Mesa Verde.

**Detention Standards Binding GEO Group in its Operation of Mesa Verde: 2011 ICE Performance-Based National Detention Standards, DHS Prison Rape Elimination Act of 2003 Standards, and § 504 of the Rehabilitation Act of 1973**

28. GEO Group, in operating Mesa Verde, is obligated to comply with the 2011 ICE Performance-Based National Detention Standards (PBNDS), DHS's Prison Rape Elimination Act (PREA) regulations, and § 504 of the Rehabilitation Act of 1973, as these standards are adopted contractually by GEO Group in its contract with ICE to hold noncitizens at Mesa Verde.

29. On March 7, 2014, DHS issued Final Rule, 6 C.F.R. Part 115, Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities, also known as the DHS PREA Standards.

30. Per ICE, the DHS PREA Standards "establish robust safeguards against sexual abuse and assault of individuals in DHS custody" and set out "robust requirements for screening, training, detainee education, reporting, response, medical care, investigative protocols, discipline, and monitoring and oversight."

31. The DHS PREA Standards are binding on GEO Group under its contract with ICE to operate Mesa Verde.

32. All ICE detention facilities are required to comply with § 504 of the Rehabilitation Act, which prohibits discrimination based on disability and requires facilities to provide individuals with disabilities equal access to its programs and activities through the provision of appropriate accommodations, modifications, and services.

33. GEO Group was required to comply with § 504 of the Rehabilitation Act under federal law and under its contract with ICE to operate Mesa Verde at all times that ICE detained L.V.Q. at Mesa Verde.

34.     On January 11, 2017, ICE issued the 2016 revisions to the 2011 PBNDS. The 2016 revisions incorporated, *inter alia*, all requirements in the DHS PREA Standards that are applicable to ICE detention facilities and facility personnel, and established processes to ensure compliance by detention facilities with the requirements of § 504 of the Rehabilitation Act. ICE requested adoption of the revisions for all detention facilities covered by the 2011 PBNDS through bilateral contract modifications of facilities' contracts.

35.     According to ICE, the 2011 PBNDS, "reflects ICE's ongoing effort to tailor the conditions of immigration detention to its unique purpose while maintaining a safe and secure detention environment for staff and detainees." Further, "PBNDS 2011 is crafted to improve medical and mental health services, increase access to legal services and religious opportunities, improve communication with detainees with limited English proficiency, improve the process for reporting and responding to complaints, and increase recreation and visitation."

36.     At all times relevant here, GEO Group was bound by the 2016 revisions to the 2011 PBNDS in its contract with ICE for Mesa Verde.[3]

### *The 2011 PBNDS: Relevant Provisions*

37.     The 2011 PBNDS, incorporating the DHS PREA Standards, contains a full section on sexual assault prevention and intervention, under PBNDS 2.11, *Sexual Abuse and Assault Prevention and Intervention.*

38.     Provisions under PBNDS 2.11 require that GEO Group develop and adhere to a "written zero tolerance policy for sexual abuse or assault, outlining the facility's approach to preventing, detecting, and responding to such conduct." PBNDS 2.11(II)(1). This policy and its procedures constitute a facility's Sexual Abuse or Assault Prevention and Intervention Program. PBNDS 2.11(V)(A).

39.     The policy must include, at minimum, procedures for assessing all individuals for their risk of engaging in sexually abusive behavior or of being victimized and procedures for housing detained individuals in accordance with their classification assessment. PBNDS 2.11(V)(A)(1).

---

[3] Hereinafter, all references to "2011 PBNDS" and "PBNDS" refer to the version of the 2011 PBNDS that includes the 2016 revisions.

40.     The policy must also include reporting procedures, including procedures for immediate reporting of sexual abuse allegations through the facility's chain of command – including to the highest facility official – requiring all staff to report allegations or suspicions of sexual assault, and requiring written documentation such that all allegations or suspicions are properly reported and addressed. PBNDS 2.11(V)(A)(2).

41.     The policy must also include procedures for "prompt and effective intervention to address the safety and treatment needs of [] victims if an alleged assault occurs," including "procedures for offering immediate protection" and "methods for addressing the alleged victim's future safety, medical, and mental health needs." PBNDS 2.11(V)(A)(3).

42.     On information and belief, GEO Group has developed internal policies and procedures to comply with PREA standards per its contract with ICE and its legal obligations. These policies include, but are not limited to, GEO Group's Corporate Policy & Procedure Manual No. 5.1.2, *Zero Tolerance Policy Towards Sexual Abuse and Harassment*, and No. 5.1.2-F, *Investigating Allegations of Sexual Abuse and Assault and Evidence Collection in Immigration Detention Facilities*, as well as GEO Group/MVIPC Policy 11.1.6, *Sexual Abuse Assault Protection and Intervention (SAAPI) for Immigration Facilities*. GEO Group must adhere to these policies under PBNDS. PBNDS 2.11(II)(1).

43.     The 2011 PBNDS require that facilities perform an admissions process for newly arrived individuals at each facility. PBNDS 2.1(V)(A), (B)(1). This process must include medical and mental health screening. PBNDS 2.1(V)(A), (B)(1), 4.3(V)(J). A health care provider or a specially trained detention officer must conduct an initial medical and mental health screening "no later than 12 hours after arrival," at which they must ask the individual for information regarding any known acute or emergent medical conditions. PBNDS 4.3(V)(J). Individuals raising such medical conditions must be sent for evaluation by a qualified, licensed health care provider within two working days. *Id.*

44.     Facility staff must help individuals who have hearing disabilities with all medical care activities, including during the admission process. *Id.*

45.     The 2011 PBNDS requires facilities to "take appropriate steps to ensure that detainees with disabilities . . . have an equal opportunity to participate in or benefit from all aspects of the facility's efforts to prevent, detect, and respond to sexual abuse." PBNDS 2.11(V)(G). It is incumbent upon

facility staff to identify individuals with disabilities that are open, obvious and apparent, whether through medical or intake screenings or through direct observation. PBNDS 4.8(V)(C).

46.     PBNDS requires facilities to screen all individuals on intake to identify those who are vulnerable to victimization or assault, and in particular, sexual abuse. PBNDS 2.2(II)(6), (V)(C), 2.11(II)(8), (V)(I)(1), 4.3(V)(J). GEO Group employees must use that information to house individuals to prevent sexual abuse, take all necessary steps to mitigate any such danger, and inform assignment to recreation and other activities. PBNDS 2.2(II)(6), (V)(C), 2.11(II)(8), (V)(I)(1).

47.     In evaluating risk of sexual abuse, GEO Group and Mesa Verde staff must consider whether an individual has a mental, physical, or developmental disability. PBNDS 2.11(V)(I)(1)(a). GEO Group and Mesa Verde staff must also consider whether the individual has previously been incarcerated and whether there is a history of prior institutional sexual abuse. PBNDS 2.11(V)(I)(1).

48.     Individuals considered at risk must be placed in the least restrictive housing that is available and appropriate. PBNDS 2.11(II)(7), (V)(J).

49.     GEO Group and Mesa Verde staff are required to "ensure that detainees with disabilities . . . have an equal opportunity to participate in or benefit from all aspects of the facility's Sexual Abuse and Assault Prevention and Intervention Program," PBNDS 2.11(II)(5), including "meaningful access to all aspects of the facility's efforts to prevent, detect, and respond to sexual abuse," PBNDS 2.11(V)(G), and to provide communication assistance to individuals with disabilities, such that they receive effective communication, PBNDS 2.2(II)(8), 2.4(II)(9), 2.11(II)(18), (V)(F)–(G).

50.     GEO Group and Mesa Verde staff are required to "be alert to potential risks or signs of sexual abuse or assault, and take appropriate action to mitigate any identified risks or protect a detainee as necessary." PBNDS 2.11(II)(7), (V)(I).

51.     GEO Group and Mesa Verde staff are also required to "immediately report any knowledge, suspicion, or information regarding an incident of sexual abuse or assault . . . or any staff neglect or violation of responsibilities which may have contributed to an incident . . . ." PBNDS 2.11(II)(10), (V)(L).

52.     All allegations of sexual abuse or assault must be immediately reported to ICE and investigated by an appropriate criminal or administrative investigative body, and alleged victims must be promptly referred for medical or mental health services. PBNDS 2.11(II)(11)–(12), (14).

53.     All facility staff are required to take seriously all statements from detained individuals claiming to be victims of sexual assault. PBNDS 2.11(V)(J). Individuals who allege that they have been sexually assaulted must be offered immediate protection and separation from the assailant and referred for medical examination. *Id.*

54.     Individuals who are in protective custody following a sexual assault shall not be returned to the general population until completion of a proper re-assessment, taking into consideration any increased vulnerability of the individual as a result of the assault. *Id.*

55.     All GEO Group and Mesa Verde staff must be trained on their responsibilities under the facility's Sexual Abuse and Assault Prevention and Intervention Program, and all GEO Group and Mesa Verde staff must receive an annual refresher training. PBNDS 2.11(II)(3), (V)(E).

56.     Training must "ensure facility staff are able to fulfill their responsibilities" under PBNDS 2.11 and must include the facility's zero-tolerance policy, recognition of situations where sexual abuse and assault may occur, working with vulnerable populations and addressing their potential vulnerability in the general population, recognition of signs of sexual abuse or assault, and prevention, recognition, and appropriate response to allegations or suspicions of sexual assault involving detained individuals with mental or physical disabilities. PBNDS 2.11(V)(E).

### *The 2011 PBNDS and § 502 of the Rehabilitation Act: Relevant Provisions*

57.     GEO Group and its staff are required to comply with § 504 of the Rehabilitation Act and the provisions requiring reasonable accommodation of disabilities under the 2011 PBNDS. PBNDS 4.8(II)(1)–(2).

58.     GEO Group and its staff must take appropriate steps to allow for effective communication with individuals with disabilities. PBNDS 4.8(V)(E).

59.     The 2011 PBNDS also recognizes that individuals with a cognitive disability, "including a traumatic brain injury," may have difficulties navigating detention and may not understand the process

for requesting accommodations. Accordingly, staff should provide appropriate assistance to these individuals, even if not explicitly requested. PBNDS 4.8(V)(F)(3).

60.     GEO Group and its staff are required to provide all facility staff training on reasonable accommodations policies and procedures, including the actions they must take upon identifying an individual at the facility with a disability who may need an accommodation, modification, or aid. PBNDS 4.8(II)(7), (V)(I).

**GEO Group's Faulty Intake of L.V.Q. and Failure to Flag L.V.Q.'s Vulnerabilities**

61.     Mesa Verde staff conducted a medical intake screening for L.V.Q. on January 18, 2018. The intake screening was performed by a Licensed Vocational Nurse named I. Ford. Nurse Ford recorded her notes from the intake screening on a GEO Group form titled "Intake Screening." Nurse Ford's screening erroneously recorded that L.V.Q. had no learning disabilities and no history of special education classes. Nurse Ford also erroneously noted that L.V.Q. did not appear to present with any barriers to communication, nor a low level of intellectual functioning, either based on history or on current presentation. She did note, however, that L.V.Q. used hearing aids.

62.     While the mental health screening portion of the GEO Group Intake Screening form purports to assess risk of physical and sexual assault, it relies solely on self-reported answers. The intake form lists questions such as, "Have you ever been a victim of physical or sexual abuse?" and "Do you feel that you are currently in danger of being physically or sexually assaulted?" L.V.Q. answered both questions, "No."

63.     The GEO Group Intake Screening form completed by Nurse Ford was reviewed by M. Galinato, NP-C, on January 19, 2018, and Mike Ahmadshahi, Psychologist, on January 21, 2018.

64.     On January 18, 2018, the date of L.V.Q.'s intake, someone added "Hearing Loss/impairment" to a GEO Group form titled "Master Problem List." The Master Problem List states that it includes "major problems: (require follow-up as may significantly affect health)." L.V.Q.'s hearing loss was the only entry added in January 2018.

65.     L.V.Q. received a physical examination on January 19, 2018 by M. Galinato, NP-C. The examination notes, recorded on a GEO Group form titled "Physical Assessment (for Physical/NP/PA)," state that L.V.Q. was hospitalized after a fall in his childhood, but erroneously does not note any

cognitive disabilities. The examination notes in the "Physical Assessment" form and another GEO Group form titled "Progress Notes" flag both L.V.Q.'s hearing loss and visual impairment. The notes also reflect that L.V.Q. reported to Nurse Practitioner Galinato that his hearing aid did not work. A. Baruiz, MD reviewed the examination on January 25, 2018.

66.     In these intake and initial assessments, GEO Group and Mesa Verde staff never identified L.V.Q.'s cognitive disability and vulnerabilities that stem from that disability. GEO Group employees placed L.V.Q. in general population housing with no accommodations or protections relating to his cognitive disability or his hearing disability.

67.     DHS initiated removal proceedings against L.V.Q. on January 26, 2018. On February 5, 2018, at L.V.Q.'s first hearing in immigration court, the immigration judge noted potential competency issues, thus flagging a bona fide doubt as to L.V.Q.'s competency. The bona fide doubt finding established L.V.Q.'s class membership under the permanent injunction issued in *Franco-Gonzalez v. Holder*, No. CV 10-02211 DMG, 2013 WL 3674492 (C.D. Cal. Apr. 23, 2013), which required the government to provide bond hearings and attorneys at the government's expense to unrepresented individuals with serious mental health diagnoses or disabilities facing removal while in ICE custody, *id.* at *20.

68.     At L.V.Q.'s January 26, 2018 hearing, the attorney for DHS confirmed that the intake conducted by GEO Group and Mesa Verde staff did not capture any competency-related or mental health diagnoses for L.V.Q.

69.     On February 21, 2018, DHS filed L.V.Q.'s CDCR medical records in immigration court. These medical records included repeated notations of CDCR's inclusion of L.V.Q. in their Developmental Disability Program, as well as the accommodations CDCR implemented to ensure L.V.Q. could understand written and oral communication. On information and belief, L.V.Q.'s CDCR medical records were in the possession of GEO Group and Mesa Verde staff.

70.     Also at the February 21, 2018 hearing, the immigration judge ordered a forensic competency evaluation to determine whether L.V.Q. was competent to represent himself in immigration court.

71.     On April 4, 2018, the immigration judge received a forensic competency evaluation that diagnosed L.V.Q. with Major Neurocognitive Disorder caused by a Traumatic Brain Injury and found him not competent to represent himself in immigration court. Because of L.V.Q.'s cognitive disability,

the immigration judge found L.V.Q. to be incompetent to represent himself and appointed counsel under *Franco-Gonzalez*.

72.     On July 12, 2018, staff at Mesa Verde completed internal forms denoting L.V.Q. as a *Franco-Gonzalez* class member. Also on July 12, 2018, GEO Group added "Development Disorder" and "Franco-Gonzalez" to L.V.Q.'s Master Problem List. Upon information and belief, until this point, L.V.Q. had no documentation created by GEO Group employees or Mesa Verde staff that designated him as cognitively disabled or otherwise vulnerable based on his cognitive disability, despite clear notice and despite contractual and legal requirements that GEO Group properly and affirmatively screen and identify individuals with such disabilities.

**GEO Group's Failure to Provide L.V.Q. Hearing Aids**

73.     On February 21, 2018, in immigration court, L.V.Q. stated on the record that his hearing aid was broken.

74.     L.V.Q. affirmatively requested hearing aids from GEO Group and Mesa Verde medical staff in March 2020 and repeatedly requested them throughout 2020.

75.     On or around June 18, 2020, a GEO Group medical note recorded that L.V.Q. had not been provided working hearing aids since he arrived in ICE custody in January 2018, two-and-a-half years earlier.

76.     In or around September of 2020, L.V.Q. received an evaluation by an audiologist.

77.     In or around November 2020, a hearing aid specialist recommended that L.V.Q. needed hearing aids for both ears.

78.     By December 31, 2020, L.V.Q. still had not received new hearing aids. L.V.Q. sent another medical request, alerting GEO Group employees and Mesa Verde medical staff that he has problems hearing instructions from the officers. GEO Group employees responded that they have no control over L.V.Q.'s "hearing consult/aid."

79.     On January 10, 2021, L.V.Q. still had not received his hearing aids.

80.     Upon information and belief, L.V.Q. received hearing aids while he was held in ICE custody at Mesa Verde at an unknown time after January 10, 2021. L.V.Q. went at least three years at Mesa Verde without any access to functional hearing aids.

81. Even after L.V.Q. received hearing aids, he repeatedly had issues accessing his hearing aids or accessing functional batteries for his hearing aids for the remainder of the time he was at Mesa Verde. At some point in or around summer 2022, GEO Group employees also took L.V.Q.'s hearing aids from L.V.Q., such that he could not access them.

82. When ICE released L.V.Q. from its custody on August 11, 2022, L.V.Q. left Mesa Verde with hearing aids that did not work.

83. Although multiple medical staff at Mesa Verde diagnosed and recorded L.V.Q.'s hearing loss, need for a hearing aid, and the fact that his current hearing aid was not working, L.V.Q. spent the nearly four years that ICE detained him at Mesa Verde without consistent access to functional hearing aids, despite repeated requests.

84. GEO Group employees failed to provide L.V.Q. with operational hearing aids or an alternative accommodation, failed to provide him with continuous access to his hearing aids or an alternative accommodation, and failed to ensure that his hearing aids had functional batteries, throughout the time that L.V.Q. was at Mesa Verde.

**GEO Group's Failure to Act Despite a Known Pattern of Targeting and Harming L.V.Q.**

85. L.V.Q. began attending monthly mental health sessions at Mesa Verde with T. Davis, a Licensed Clinical Social Worker, beginning, at the latest, in approximately November 2018. L.V.Q. repeatedly reported to medical staff at these mental health sessions that he was being harassed, disrespected, tricked, and sexually harassed by his dormmates.

86. Health care providers at Mesa Verde repeatedly noted in written records, recorded on a GEO Group form titled "Progress Notes," examples of L.V.Q.'s vulnerability to manipulation and exploitation by other detained individuals because of his cognitive disability. Each form identified L.V.Q.'s disorganized thought content, poor insight and judgment, and poor memory, as well as his cognitive disability, which was labeled as either an "intellectual disorder" or a "developmental disorder" under the DSM-V. Each form was signed by both a Licensed Clinical Social Worker and a Registered Nurse.

87. On or around May 15, 2019, GEO Group began contracting medical services with Wellpath, at which point the "Progress Notes" form became a Wellpath form. However, T. Davis continued providing monthly mental health sessions and continued recording the same issues.

88. Despite L.V.Q.'s continued reporting that such harassment and exploitation was happening, GEO Group and Mesa Verde staff did not intervene to stop or prevent harm to him.

89. On or around December 27, 2020, Mike Ahmadshahi, a psychologist, designated L.V.Q. as not appropriate for general population housing, and stated that L.V.Q. required "[a]ppropriate housing to minimize possibility of victimization due to limitation in understanding of risk in social situation, being manipulated or bullied."

90. At the meeting on or around December 27, 2020, L.V.Q. reported to Dr. Ahmadshahi that he did not like living in "Charlie dorm" because other detained individuals were making fun of him.

91. Dr. Ahmadshahi discussed changing L.V.Q.'s housing with Lieutenant Perez, an employee of GEO Group. L.V.Q. was moved from "Charlie dorm" to "Delta dorm" following his discussion with Dr. Ahmadshahi.

92. On or around January 10, 2021, L.V.Q. had a follow-up mental health appointment with Dr. Ahmadshahi. Dr. Ahmadshahi again noted that L.V.Q. had been bullied by individuals in "Charlie dorm" and that L.V.Q. "[h]as deficits in understanding of the risks in social situation and social judgment and being manipulated by other detainees." Nonetheless, at the appointment, Dr. Ahmadshahi merely advised L.V.Q. "to place a self-referral and/or inform staff" if he had any other problems with other detained individuals or his housing situation.

93. Despite the reports regarding the abuse and harassment he was enduring, GEO Group employees housed L.V.Q. in general population dorms without any additional protective measures or accommodations throughout the entire time that he was detained at Mesa Verde.

94. On or around August 14, 2021, an individual in ICE custody physically attacked L.V.Q. while at Mesa Verde and GEO Group employees transferred L.V.Q. to a local hospital for treatment. L.V.Q. feared for his life during this attack. No one from GEO Group or ICE notified L.V.Q.'s attorneys or family about his transfer to the hospital or the reasons for taking him to the hospital.

95. Upon return from the hospital, GEO Group employees placed L.V.Q. back in general population housing.

96.     GEO Group employees did not contact the Bakersfield Police Department until August 29 and 30, 2021. The Bakersfield Police Department took a police report on the incident on August 31, 2021. The Bakersfield police did not interview L.V.Q. or the individual who attacked L.V.Q.

97.     On or around May 22, 2022, L.V.Q. endured another assault while at Mesa Verde, resulting in his hospitalization. Lieutenant Harrison, a GEO Group employee, later stated that he knew about this assault. ICE Officer Juan Abad later confirmed to L.V.Q.'s counsel that staff at Mesa Verde knew about this assault and there was still an ongoing investigation as of July 15, 2022.

98.     All of these incidents were known to employees of GEO Group. GEO Group knew that L.V.Q. was particularly vulnerable to bullying, harassment, targeting, and sexual misconduct because of his cognitive disorder and his unaccommodated hearing disability, and that he had suffered from numerous incidences of physical and sexual harassment and assault prior to the sexual assaults he endured in June of 2022.

99.     Despite this knowledge that L.V.Q. had multiple disabilities and was particularly vulnerable to sexual abuse and assault, GEO Group and its employees provided no protective measures or accommodations to protect L.V.Q. from further suffering sexual abuse and assault, as required by GEO Group's contractual obligations, applicable detention standards, legal requirements, and its duty of care to L.V.Q.

100.    Upon information and belief, GEO Group failed to properly train, supervise, and/or control its employees to ensure that they provided such protective measures and accommodations to protect L.V.Q. from repeated sexual abuse and assault, given their knowledge of his disabilities, vulnerabilities, and history of being targeted for abuse and assault, as required by the contractual obligations, applicable detention standards, and legal requirements binding GEO Group, and the duty of care owed by GEO Group and its employees.

**GEO Group's Failure to Prevent the Two June 2022 Sexual Assaults L.V.Q. Endured**

101.    On an unknown date in approximately early June 2022, another individual in ICE custody sexually assaulted L.V.Q. by touching L.V.Q.'s genitals under the table.

102.    This same individual had previously, on multiple occasions, put his hands inside L.V.Q.'s clothing, followed L.V.Q. into the showers, and engaged in unwanted sexual touching at night while

L.V.Q. was sleeping. L.V.Q. repeatedly told this individual not to behave in these ways towards L.V.Q., including telling the individual that he was hurting L.V.Q., but the individual did not stop.

103. Mesa Verde staff labeled L.V.Q. as a perpetrator. However, L.V.Q. described the incident to a medical staff member as the other individual "playing gay" with him. L.V.Q. described to the medical staff member how the other individual put his hand under the table and touched L.V.Q.'s genitals, as well as the previous pattern of sexual touching without L.V.Q.'s consent. L.V.Q. reported that others had witnessed these events, but he did not want to report the events to staff out of fear.

104. On or around June 7, 2022, another detained individual sexually assaulted L.V.Q. in the shower area within general population housing.

105. L.V.Q. was showering and shaving in the shower area when the other individual approached L.V.Q. from behind. The individual grabbed a shampoo bottle, put shampoo in his hand, and inserted either his hand or the shampoo bottle inside L.V.Q.'s anus.

106. This nonconsensual forced penetration caused immense pain, fear, and emotional suffering to L.V.Q.

107. L.V.Q. cut his cheek with his razor because of the forced penetration.

108. L.V.Q. told the individual to stop, but the individual did not and continued inserting his hand or the shampoo bottle into L.V.Q.'s anus.

109. The individual only stopped when other people entered the shower area of the bathroom.

110. After exiting the shower area, L.V.Q. encountered Officer Brooks, a GEO Group employee. He told Officer Brooks that he had cut himself shaving. However, L.V.Q. did not immediately report the sexual assault because he did not want to be a "snitch." L.V.Q. had consistently feared being labeled as a "snitch" while detained at Mesa Verde, because he feared that he would get in trouble for "snitching," receive a disciplinary infraction from GEO Group employees, and be deported by ICE. L.V.Q. thus tried to go to sleep without alerting anyone of what happened.

111. L.V.Q. woke up the next morning and found his boxer shorts stained with blood. He alerted GEO Group employees and asked to go to the medical unit.

112. At the medical unit at Mesa Verde, L.V.Q. told Eric Evangelista, a Certified Physician Assistant, what happened, and reported rectal pain during the assault as constant and ten out of ten in severity.

113. L.V.Q. also said he was not comfortable going back to his dorm and would rather stay in the Restrictive Housing Unit (RHU). The RHU is solitary confinement.

114. GEO Group employees transferred L.V.Q. to Adventist Health Bakersfield Hospital, to the emergency room.

115. At the hospital, medical staff noted that L.V.Q. suffered from severe tearing around his anus from the assault.

116. When medical staff asked L.V.Q. to rate the pain level he experienced while he was forcibly penetrated, with ten being the highest level of pain, L.V.Q. again rated the pain at a ten.

117. No one from GEO Group, Mesa Verde, or ICE notified L.V.Q.'s attorneys or family about his transfer to the hospital or the reasons for taking him to the hospital.

118. Instead, L.V.Q. called his sister from the hospital, telling his sister that he was very confused, terrified, and in pain and bleeding. L.V.Q. also told his sister that he felt like he was going crazy and could not take this situation anymore.

119. On or around June 10, 2022, while L.V.Q. was still at the hospital, the emergency room staff at the Adventist Health Bakersfield Hospital contacted the Bakersfield Police Department. L.V.Q. provided a statement to Officer Fabian Salazar of the Bakersfield Police Department at the hospital. Officer Salazar asked L.V.Q. if he wanted to undergo a Sexual Assault Response Team (SART) examination. L.V.Q. agreed and accompanied Officer Salazar to the SART exam facility. The SART nurse conducted a SART exam on L.V.Q. and took photographs of him. The exam results and photographs were sent to the Investigation Unit of the Bakersfield Police Department as evidence.

120. Officer Salazar asked L.V.Q. if he wanted to press charges against the individual who attacked him. L.V.Q. responded that he did not because he did not want to be labeled as a "snitch."

121. Officer Salazar reached out to Mesa Verde and spoke with Lieutenant Harrison. Lieutenant Harrison stated that he thought L.V.Q. was at the hospital because of the assault L.V.Q. endured on May 22, 2022. Lieutenant Harrison stated that he did not know about the sexual assault L.V.Q. endured on June 7, 2022.

122. The hospital discharged L.V.Q. on June 10, 2022, and he was transported back to Mesa Verde. After L.V.Q. was back at Mesa Verde, he spoke very little and was very scared.

123. On June 13, 2022, during a medical evaluation at Mesa Verde, L.V.Q. reported that he suffered from constipation and blood-smeared stool.

124. On July 26, 2022, L.V.Q., through counsel, submitted a request to ICE that L.V.Q. be released from ICE custody, citing an ICE directive that directs ICE to exercise prosecutorial discretion in cases involving victims of crime, and arguing that L.V.Q.'s cognitive and physical disabilities make him particularly vulnerable to serious harm in a detention center. On August 11, 2022, ICE released L.V.Q. from its custody.

125. L.V.Q. suffered extraordinary pain, fear, and emotional distress because of the two sexual assaults he endured in June 2022. He also suffered from high levels of fear and emotional distress that he would continually and repeatedly be a target for physical and sexual harassment and assault while at Mesa Verde, because there was no indication during the four years that he was at Mesa Verde that GEO Group employees would act to protect him.

126. L.V.Q. continues to suffer from extreme psychological and emotional distress from the two sexual assaults he endured, from GEO Group's failure to protect him, and from GEO Group's violations of detention standards.

127. L.V.Q. attempts to avoid thinking and talking about the assaults he endured because doing so is very distressing to him, a hallmark sign of a trauma disorder. Because of his cognitive disability, L.V.Q. cannot express his thoughts and feelings effectively, making it particularly difficult for him to process these sexual assaults and heal from the ensuing trauma.

128. L.V.Q. is also at heightened risk of exhibiting a delayed Post-Traumatic Stress Disorder or other diagnosis because of the trauma he continues to endure.

129. To this day, L.V.Q. continues to engage in behavior that evinces his ongoing trauma. He will insist that he needs to engage in certain behaviors, such as keep his hair long or wear women's clothing. L.V.Q. communicates that this is what others instructed him he needed to do while in ICE custody. His fear is that he will otherwise be harmed if he does not engage in these behaviors, even though he is no longer in ICE custody. In these moments, he will often dissociate. His family is unable to soothe him or convince him that he is safe.

130.    L.V.Q. also stays quiet and frequently refuses to talk or engage with people. He will act scared and hide in his room, away from his family. His family reports that he is an entirely different person than the person they knew before these events.

## **CAUSES OF ACTION**

### **FIRST CAUSE OF ACTION**

### **Negligence**

131.    L.V.Q. incorporates by reference the facts set forth in each of the preceding paragraphs.

132.    To establish a claim for negligence, a plaintiff must show (1) that the defendant owed the plaintiff a legal duty; (2) that the defendant breached that duty; and (3) that the breach was a proximate or legal cause of the plaintiff's injuries.

133.    The GEO Group, Inc. is directly liable for employees' conduct where it was negligent in training, supervising, or controlling its employees.

134.    The GEO Group, Inc. is vicariously liable for its employees' conduct under a theory of respondeat superior because its employees' interactions with and conduct relating to L.V.Q. were directly within the scope of their employment and their tortious actions arose from and were reasonably foreseeable in light of their employment duties.

135.    Pursuant to its federal contract with ICE to detain noncitizens, and pursuant to the "special relationship" between a jailer and prisoner, The GEO Group, Inc. and its employees assumed a duty of care to L.V.Q. during the time that ICE detained him at Mesa Verde.

136.    The GEO Group, Inc. and its employees' duty of care included keeping L.V.Q. safe and secure from physical and sexual harm.

137.    The GEO Group, Inc. and its employees' duty of care included ensuring that L.V.Q.'s disabilities be reasonably accommodated.

138.    The GEO Group, Inc.'s duty of care included ensuring that its employees were properly trained, supervised, and controlled in sexual assault prevention, response, and care, and disability accommodations.

139.    The GEO Group, Inc. and its employees were on notice that L.V.Q. was vulnerable to harm.

140.    The GEO Group, Inc. and its employees were on notice that L.V.Q. required hearing aids.

141.  The GEO Group, Inc. and its employees breached its duty of care to L.V.Q. when it failed to adequately protect L.V.Q. from the two sexual assaults he endured in June 2022.

142.  The GEO Group, Inc. breached its duty of care to L.V.Q. when it failed to properly train, supervise, and control its employees in accordance with required standards of sexual assault, prevention, and care.

143.  The GEO Group, Inc. and its employees' breach of duty proximately caused L.V.Q.'s injuries, including physical pain, emotional distress, and psychological trauma.

**SECOND CAUSE OF ACTION**

**Negligent Infliction of Emotional Distress**

144.  L.V.Q. incorporates by reference the facts set forth in each of the preceding paragraphs.

145.  To establish a claim for negligent infliction of emotional distress under California law, a plaintiff must show (1) that the defendant engaged in negligent conduct, (2) that the plaintiff suffered serious emotional distress; and (3) that the defendant's negligent conduct was a cause of the serious emotional distress.

146.  The GEO Group, Inc. and its employees engaged in negligent conduct where they were aware that L.V.Q. was vulnerable to and enduring physical and sexual harm and harassment, both because of his cognitive and his hearing disability, but failed to protect him from the two sexual assaults he suffered in June 2022.

147.  The GEO Group, Inc. and its employees engaged in negligent conduct where they were aware that L.V.Q. required hearing aids and failed to provide these to him.

148.  The GEO Group, Inc. engaged in negligent conduct where it failed to properly train, supervise, and control its employees in sexual assault prevention, response, and care, and disability accommodations.

149.  L.V.Q. suffered serious emotional distress from enduring repeated physical and sexual harm, and from having to continuously fear being a repeated target for harm because of The GEO Group and its employees' lack of action to protect him.

150.  The GEO Group and its employees' negligence was the cause for L.V.Q.'s serious emotional distress.

**THIRD CAUSE OF ACTION**

**Cal. Civ. Code §§ 51, 52 (Unruh Civil Rights Act)**

151.    L.V.Q. incorporates by reference the facts set forth in each of the preceding paragraphs.

152.    Under the Unruh Civil Rights Act, "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b). Additionally, a violation of the right of any individual under the federal Americans with Disabilities Act of 1990 shall also constitute a violation of the Unruh Civil Rights Act. *Id.* § 51(f).

153.    Under California law, anyone who "denies, aids or incites a denial, or makes any discrimination or distinction contrary to [the Unruh Civil Rights Act] is liable for each and every offense . . . ." *Id.* § 52(a).

154.    The GEO Group, Inc. and its employees have a duty to comply with the Unruh Civil Rights Act where The GEO Group, Inc. conducts business in the State of California, including at Mesa Verde.

155.    The GEO Group, Inc. and its employees were on notice of L.V.Q.'s need for accommodation based on his cognitive and hearing disabilities.

156.    The GEO Group, Inc. and its employees failed to accommodate L.V.Q.'s disabilities at Mesa Verde during the time ICE detained L.V.Q. at Mesa Verde.

157.    The GEO Group, Inc. and its employees' failure to accommodate L.V.Q.'s disabilities resulted in harm to L.V.Q.

**FOURTH CAUSE OF ACTION**

**Cal. Gov. Code § 7320**

158.    L.V.Q. incorporates by reference the facts set forth in each of the preceding paragraphs.

159.    The GEO Group, Inc. is a private detention facility operator.

160.    The GEO Group, Inc. is legally required to exercise a duty of ordinary care and skill in its compliance and adherence to the detention standards of care and confinement agreed upon in its contract with ICE for operation of Mesa Verde.

161. The 2011 PBNDS, DHS's PREA Standards, and § 504 of the Rehabilitation Act are the applicable detention standards for care and confinement that The GEO Group, Inc. agreed to abide by in its contract to operate Mesa Verde.

162. The GEO Group, Inc. violated the 2011 PBNDS sections 2.2(II)(6), (V)(C), 2.11(II)(7)–(8), (V)(A)(1), (V)(G), (V)(I)(1), 4.3(V)(J), and 4.8(V)(C), (V)(F)(3), and § 504 of the Rehabilitation Act when it failed to properly and timely assess and identify L.V.Q.'s cognitive disability and his vulnerability to sexual abuse and assault because of his cognitive and hearing disabilities, consider L.V.Q.'s disabilities in assessing his risk for sexual assault, and consider such risk in assigning housing and providing other accommodations and/or protective measures to mitigate such risk.

163. The GEO Group, Inc. violated the 2011 PBNDS sections 2.2(II)(5), (II)(8), 2.4(II)(9), 2.11(II)(5), (II)(18), (V)(F)–(G), and 4.8(II)(1)–(2), (V)(C), (V)(F)(3), and § 504 of the Rehabilitation Act when it failed to ensure that L.V.Q., who had an open, obvious, and apparent cognitive disability and a traumatic brain injury, was properly identified as an individual with a disability, received appropriate assistance and accommodations for his cognitive and hearing disabilities, had equal opportunity to participate in and meaningful access to Mesa Verde's Sexual Abuse and Assault Prevention and Intervention Program and all other programs at Mesa Verde, and that L.V.Q. could receive effective communication throughout his time at Mesa Verde.

164. The GEO Group, Inc. violated the 2011 PBNDS sections 2.11(II)(5), (II)(7), (II)(10)–(12), (II)(14), (V)(A)(2)–(3), (V)(G), (V)(I)–(J), (V)(L) and 4.8(V)(F)(3), and § 504 of the Rehabilitation Act when it failed to immediately report incidents where L.V.Q. was sexually abused or assaulted, failed to report staff neglect or violation that may have contributed to incidents where L.V.Q. was sexually abused or assaulted, failed to investigate timely incidents of sexual abuse and assault, failed to investigate after having knowledge of L.V.Q.'s disabilities and a pattern of sexual abuse and assault against L.V.Q., failed to offer immediate protection following incidents of sexual abuse and assault, and failed to act to prevent future sexual abuse and assaults after having knowledge of L.V.Q.'s disabilities and the pattern of sexual abuse and assault against L.V.Q.

165. The GEO Group, Inc. violated the 2011 PBNDS sections 2.11(V)(E) by failing to train facility staff to ensure that facility staff were able to fulfill their responsibilities under Mesa Verde's Sexual

Abuse and Assault Prevention and Intervention Program, including working with vulnerable populations and addressing their vulnerability in the general population, recognition of signs of sexual abuse or assault, and prevention, recognition, and appropriate response to allegations or suspicions of sexual assault involving detained individuals with mental or physical disabilities.

166.    The GEO Group, Inc. violated DHS's PREA Standards by failing to prevent, detect, and respond to the sexual abuse that L.V.Q. endured at Mesa Verde.

167.    The GEO Group, Inc. violated DHS's PREA Standards by failing to properly assess L.V.Q.'s risk, investigate, report, and respond to the sexual abuse that L.V.Q. endured at Mesa Verde.

168.    As a result, L.V.Q. was physically and sexually assaulted and lived in fear that he would continue to be physically and sexually assaulted while he was held in ICE custody at Mesa Verde.

169.    The GEO Group, Inc.'s above-described acts towards L.V.Q. constituted tortious actions.

170.    The GEO Group, Inc.'s tortious actions in violation of the PBNDS, DHS's PREA Standards, and § 504 of the Rehabilitation Act caused L.V.Q.'s injuries, including physical pain, emotional distress, and psychological trauma.

171.    The GEO Group, Inc. did not exercise ordinary care, as it failed to substantially comply with the PBNDS, PREA, and § 504 of the Rehabilitation Act.

## PUNITIVE DAMAGES

172.    L.V.Q. incorporates by reference the facts set forth in each of the preceding paragraphs.

173.    In failing to protect L.V.Q. from harm despite knowing about his vulnerabilities and knowing that he had been repeatedly physically and sexually harmed because of those vulnerabilities, The GEO Group, Inc. and its employees acted with malice and oppression.

174.    By allowing L.V.Q. to be repeatedly harassed, victimized, and assaulted, knowing that L.V.Q. was particularly susceptible because of his disabilities, and knowing that L.V.Q. had been previously harassed, victimized, and assaulted because of his disabilities, without taking any action to prevent future physical and sexual assault, The GEO Group, Inc. and its employees engaged in despicable conduct with a willful and conscious disregard for the rights and safety of L.V.Q.

175.    On information and belief, The GEO Group, Inc. ratified its employees' conduct by failing to address or remedy their ongoing failure to act to protect L.V.Q.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff prays that this Court grant the following relief:

(1)     Award compensatory and punitive damages to Plaintiff in an amount to be proven at trial;

(2)     Award costs and reasonable attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(b), Cal. Civ. Code § 52(b)(3), Cal. Gov. Code § 7320(c), and any other applicable law; and

(3)     Grant such further relief as the Court deems just and proper.


Dated: June 3, 2024                                         IMMIGRANT LEGAL DEFENSE


                                                  By:  _/s/ Tania Linares Garcia_
                                                        Tania Linares Garcia
                                                        Jessica Zhang
                                                        Claudia Valenzuela
                                                        IMMIGRANT LEGAL DEFENSE
                                                        1301 Clay St., #70010
                                                        Oakland, CA 94612
                                                        tania@ild.org

                                                        *Attorneys for Plaintiff L.V.Q.*