Tania Linares Garcia
Jessica Zhang*
Claudia Valenzuela*
Christina Lee
IMMIGRANT LEGAL DEFENSE
1301 Clay St., #70010
Oakland, CA 94612
Telephone: (510) 473-2989
Facsimile: (510) 890-3101
tania@ild.org

Maura White*
Benjamin Berkman*
ROMANUCCI & BLANDIN, LLC
321 N. Clark St., Suite 900
Chicago, IL 60654
Telephone: (312) 253-1000
mwhite@rblaw.net
bberkman@rblaw.net

*Attorneys for Plaintiff L.V.Q.*

**Admitted pro hac vice*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**FRESNO DIVISION**

| | |
|---|---|
| L.V.Q.,<br>Plaintiff,<br>v.<br>THE GEO GROUP, INC., a Florida Corporation,<br>Defendant. | Case No. 1:24-cv-00656-KES-CDB<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY ADJUDICATION** |

## TABLE OF CONTENTS

I. INTRODUCTION .......... **Error! Bookmark not defined.**
II. STATEMENT OF FACTS .......... 6
III. LEGAL STANDARD .......... 10
IV. ARGUMENT .......... 11
a. Cal. Gov. Code § 7320 Applies to Pre-Passage Conduct .......... 11
b. Plaintiff has established a triable issue of material fact as to his claim for punitive damages .......... 15
V. CONCLUSION .......... 23

# TABLE OF AUTHORITIES

**Cases**


*Am. Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton*, 96 Cal. App. 4th 1017 (2002) ....... 17

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....... 5

*Archibald v. Cnty. of San Bernardino*, 2018 WL 8949779 (C.D. Cal. 2018) ....... 10

*Bernal v. Sacramento Cnty. Sheriff's Dep't*, 73 F.4th 678 (9th Cir. 2023) ....... 5

*Botosan v. Fitzhugh,* 13 F. Supp. 2d 1047 (S.D. Cal. 1998) ....... 10

*Brothers Market LLC No. 2 v. United States,* 172 F.4th 758 (9th Cir. 2026) ....... 5

*C.O. v. Cnty. of Kern,* 2022 WL 286544 (E.D. Cal. 2022) ....... 10

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ....... 5

*Civil Rights Dept. v. Grimmwa*y Enter., Inc., 800 F. Supp. 3d 1084 (E.D. Cal. 2025) ....... 10

*Coll. Hosp. Inc. v. Superior Ct.*, 8 Cal. 4th 704 (1994) ....... 10

*Davis v. Kiewit Pacific Co.,* 220 Cal. App. 4th 358 (2013) ....... 12

*Doe 1 v. United Airlines, Inc.,* 2021 WL 4595766 (C.D. Cal. 2021) ....... 14

*Dragones v. Calkins,* 98 Cal. App. 5th 1075 (2024) ....... 8

*Egan v. Mt. of Omaha Ins. Co.,* 24 Cal. 3d 809 (1979) ....... 12

*Gorman v. Wolpoff & Abramson, LLP,* 584 F.3d 1147 (9th Cir. 2009) ....... 5

*Harris v. Capital Growth Investors XIV,* 52 Cal. 3d 1142 (1991) ....... 10

*Hobbs v. Bateman Eichler, Hill Richards, Inc.,* 164 Cal. App. 3d 174 (1985) ....... 13

*Hughes v. Blue Cross of N. California*, 215 Cal. App. 3d 832 (1989) ....... 18

*Midpeninsula Citizens for Fair Housing v. Westwood Invs.,* 221 Cal. App. 3d 1377 (1990) ....... 10

*Munson v. Del Taco, Inc.,* 46 Cal. 4th 661 (2009) ....... 10

*Nargizyan v. State Farm Gen. Ins. Co.,* 120 Cal. App. 5th 581 (2026) ....... 12

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099 (9th Cir. 2000) ....... 11

*Romo v. Ford Motor Co.,* 99 Cal. App. 4th 1115 (2002) ....... 18

*Sluimer v. Verity, Inc.*, 606 F.3d 584 (9th Cir. 2010) ....... 5

Spinks v. Equity Residential Briarwood Apartments, 171 Cal. App. 4th 1004 (2009) ....... 11

*Tolan v. Cotton*, 572 U.S. 650 (2014) ....... 5

*USS-Posco Indus. v. Case,* 244 Cal. App. 4th 197 (2016) ....... 6

*Walashek v. Air & Liquid Sys. Corp.,* 2016 WL 4197960 (S.D. Cal. 2016) ....... 14

*White v. Ultramar, Inc.,* 21 Cal. 4th 563 (1999) ....... 10

*Woodland Hills Residents Assn., Inc. v. City Council*, 23 Cal. 3d 917 (1979) .............................. 8

**Statutes**

Cal. Civ. Code § 1714 .......... 7
Cal. Civ. Code § 3294 .......... 9
Cal. Civ. Code § 52 .......... 10
Cal. Evid. Code § 669 .......... 9
Cal. Gov. Code § 7320 .......... 6

**Rules**

Fed. R. Civ. P. 51 .......... 6
Fed. R. Civ. P. 56 .......... 5

**Other Authorities**

Charles Alan Wright et al., Federal Practice & Procedure § 2727 (3d ed. 1998) .......... 11

# I. INTRODUCTION

Defendant The GEO Group, Inc.'s (GEO) Motion for Partial Summary Adjudication fails to raise any claims that are suitable for summary adjudication.[1] GEO seeks summary judgment only on two points: first, that it cannot be held liable under Cal. Gov't Code § 7320 for conduct that pre-dates January 1, 2021, the date § 7320 went into effect; and second, that Plaintiff has not established a genuine issue of material fact as to his punitive damages claim.

Summary judgment is not appropriate on either point. First, as to GEO's argument about § 7320 conduct that pre-dates January 1, 2021, GEO is not seeking judgment on a claim, but rather, seeking to exclude evidence before the jury. Such a request is properly sought through a motion in limine or through jury instructions, not through summary judgment. Regardless, § 7320 also did not create any new obligations or duties that GEO did not already have and thus, is merely prospective. Rather, GEO had already bound itself to follow the policies, laws, and regulations at issue here when it signed a highly lucrative contract with U.S. Immigration and Customs Enforcement (ICE) to operate Mesa Verde ICE Processing Center (MVIPC), well before January 1, 2021. Because § 7320 did not create new obligations for GEO, but rather, created a fee-and-cost-shifting framework, it applies to conduct that pre-dates passage of the provision.

Second, GEO has failed to produce evidence establishing no triable issue of material fact to Plaintiff's punitive damages claim under Cal. Civ. Code § 3294. There is substantial evidence showing that facility administrators and the Prevention of Sexual Assault Compliance Manager (PSA Compliance Manager) at MVIPC have substantial discretion to establish ad hoc policies that govern MVIPC. Under California law, this is sufficient to consider these individuals "managing agents" under § 3294. Plaintiff has also presented evidence showing that these "managing agents"

---

[1] GEO erroneously filed its Motion for Partial Summary Adjudication under seal. It filed a copy of its Motion for Partial Summary Adjudication as an exhibit to its Notice of Errata to its Request to Seal. *See* ECF No. 88. Because GEO has not filed its Motion for Partial Summary Adjudication as a separate docket entry, Plaintiff refers and cites to Exhibit A of ECF No. 88 as GEO's Motion for Partial Summary Adjudication ("Mtn."). All page numbers for GEO's Motion for Partial Summary Adjudication refer to the page numbers included by GEO on the bottom of the page of the Motion, for ease of reference once the Motion is docketed. GEO also included the Janecka Declaration as part of Exhibit A in ECF No. 88. *See* ECF No. 88, at 27–30. Plaintiff will cite to the Janecka Declaration by paragraph number for the purposes of this motion.

had actual knowledge of the "willful and conscious disregard" of Plaintiff's rights—knowledge that Plaintiff was not properly flagged as cognitively disabled and at risk of sexual victimization, that he was repeatedly bullied, harassed, and assaulted, and that no one acted to protect Plaintiff from sexual assault, culminating in his rape in the dorm shower. For these reasons, Plaintiff asks that this Court deny GEO's Motion for Partial Summary Adjudication.

## II. STATEMENT OF FACTS

Plaintiff L.V.Q. is a lawful permanent resident from Vietnam. Pl.'s Statement of Disputed Facts ("Pl.'s Disputed Facts") #46. He has lived in the United States since he arrived as a refugee in 1982 at the age of eight. *Id.* He is cognitively disabled and has been since he suffered a traumatic brain injury as a young child. *Id.* #45.

Between January 18, 2018, and August 11, 2022, Plaintiff was detained in ICE custody at MVIPC, an immigration detention center operated by Defendant GEO. Pl.'s Resp. to Def.'s Statement of Undisputed Facts ("Undisputed Facts"), #8–9. During that time, Plaintiff was repeatedly and consistently harassed, bullied, and assaulted. Pl.'s Disputed Facts #14, 20–22, 24, 36–37. GEO failed to protect Plaintiff, despite knowing about his disabilities and his repeated victimization, in violation of the Performance-Based National Detention Standards (PBNDS), the Department of Homeland Security's (DHS) Prison Rape Elimination Act (PREA) regulations, the Rehabilitation Act, and GEO's own policies, all of which GEO was required to comply with under its own contract with ICE to operate MVIPC. *Id.* #6, 8–34, 36–37, 40–44; Undisputed Facts #31; Def. Ans. ¶¶ 8–10, ECF No. 10. Ultimately, because of GEO's violations of policy, another detained individual anally raped Plaintiff in the D dorm shower in May 2022. Pl.'s Disputed Facts #36.

During the time that Plaintiff was at MVIPC, there were three Facility Administrators: Nathan Allen (2018-2021), Michael Knight as acting Facility Administrator (2022), and Norbal Vasquez (2022). *Id.* #2–3. The Facility Administrators oversaw and managed MVIPC. *Id.* #2. Knight was also the Chief of Security between 2020 and 2022. *Id.* #3. Catherine Harvey was the Programs Manager for the entire time Plaintiff was at MVIPC. *Id.* #1. As Programs Manager, one

of Harvey's roles was PSA Compliance Manager, which was responsible for enforcing and administering GEO's PREA policies, conducting PREA training for staff, completing required PREA reporting for MVIPC, and maintaining an "at risk log" to track individuals who were at risk of sexual victimization and committing sexual violence. *Id.* #4.

Under the PBNDS, PREA regulations, and GEO's policies, GEO is required to identify, label, and track detained individuals who are at risk of sexual victimization, to ensure they are protected from sexual harassment and assault, including in deciding how to safely house them. *Id.* #4, 10. Individuals with disabilities and who had prior sex convictions involving minors automatically were considered at risk for victimization and were required to be tracked as such. *Id.* #10–12. Identification and tracking was in large part completed through classification and PREA assessment forms completed upon intake into the facilities, as well as periodic re-classifications and re-assessments. *See id.* #7, 10–12, 40. Both classifications (and re-classifications) and PREA assessments (and re-assessments) required denoting whether an individual has a disability. *See id.* #10–12. The PREA assessments also require notation of prior convictions of sex crimes involving minors as a vulnerability, and re-assessments require identification of prior incidents where the detained individual was beaten up or threatened with being beaten up. *See id.* #10, 12, 40. The facility administrators and PSA Compliance Manager made final decisions about classification and housing. *Id.* #1. The PSA Compliance Manager also reviewed and approved PREA assessments and reassessments. *Id.* #4, 27–28. Finally, the PSA Compliance Manager was required to keep and maintain an SAAPI At-Risk Assessment Tracking Log, which was the sole method used at MVIPC to track individuals at risk of sexual victimization and at risk of sexual assault for housing and protection purposes. *Id.* #4–7. GEO was also required by PBNDS, PREA regulations, the Rehabilitation Act, and its own policies to protect detained individuals with cognitive disabilities and prevent discrimination against individuals because of their disabilities. *Id.* #17–18.

Until June 2022, when Plaintiff reported that he had been raped, GEO *never* identified, labeled, or tracked Plaintiff as someone who was at risk of sexual victimization, even though he

had cognitive and hearing disabilities, a conviction for a sex offense involving a minor, and he was repeatedly bullied, threatened, physically assaulted, and sexually harassed, all of which required him to be tracked as at-risk. *Id.* #6–7, 9–12, 27–29, 40, 42. Plaintiff's initial classification and PREA assessments failed to notate his hearing disability, a fact that GEO knew about upon Plaintiff's intake. *Id.* #11–12, 40, 47. All re-classifications and PREA re-assessments that followed failed to correct that omission, failed to identify Plaintiff's cognitive disability – which GEO staff knew about by, at the latest, July 2018 – and failed to identify the numerous incidents involving threats and assault against Plaintiff that GEO knew about and that accumulated during Plaintiff's time at MVIPC. *Id.* #8, 11–12, 25, 27–28, 40. Plaintiff was labeled as at risk of *perpetrating* sexual violence *only* on each SAAPI At-Risk Log that Catherine Harvey, the PSA Compliance Manager, circulated throughout his time at MVIPC until June 2022. *Id.* #6. The At-Risk Log, created by Harvey, had no way to track individuals with disabilities, and failed to automatically include Plaintiff as at risk of victimization, even though GEO policy required Harvey to do so based on Plaintiff's disabilities and criminal history. *Id.* #5–7, 10, 40. Because the At-Risk Log was the only method that MVIPC had for tracking individuals who were at risk of sexual victimization and of sexual violence for housing and protection purposes, Plaintiff was never logged, flagged, or tracked as someone who required additional protection from sexual victimization. *Id.* #6–7, 9–10, 40. Thus, from when he arrived at MVIPC in January 2018 until June 2022, after he was raped, Plaintiff was housed in "high" classification housing, reserved for those with the most serious criminal convictions, without any notation for staff that he had a cognitive disability and was at risk of being victimized. *Id.* #13, 40.

Throughout his time at MVIPC leading up to his rape in May 2022, Plaintiff was subjected to repeated bullying, sexual and non-sexual harassment, and assault. *Id.* #14, 20–22, 24. As relevant to this Opposition, there are a few notable incidents of harassment and assault that Allen, Vasquez, Knight, and Harvey knew about. In December 2020, Plaintiff reported to the MVIPC psychologist, Dr. Mike Ahmadshahi, that he was being bullied in C dorm because of his cognitive disability. *Id.* #14. Dr. Ahmadshahi determined that Plaintiff was not recommended for general

population because of his cognitive disability and requested that GEO staff move Plaintiff from his dorm and protect him from bullying. *Id.* Allen, Knight, and Harvey were notified that Plaintiff was being bullied because of his cognitive disability and of Dr. Ahmadshahi's request. *Id.* #15–16. In June 2021, Plaintiff was bullied again in D dorm. *Id.* #20. Allen, Knight, and Harvey were notified. *Id.* In August 2021, another detained individual beat Plaintiff so severely that Plaintiff required hospitalization. *Id.* #21. Allen, Knight, and Harvey were notified. *Id.* In November 2021, another detained individual tried to assault Plaintiff because of his prior conviction of a sex offense against a minor. *Id.* #22. Allen, Knight, and Harvey were, again, notified. *Id.* #23. Finally, before May 2022, another detained individual in Plaintiff's dorm tried to report to Knight and Lieutenant Eric Perez that a number of individuals, including the individual who ultimately raped Plaintiff in May 2022, were repeatedly sexually harassing Plaintiff in D dorm. *Id.* #24.

After each incident, Allen, Knight, and Harvey did nothing to investigate the repeated bullying, to ensure that Plaintiff was safe from future attack, or document the fact that Plaintiff had now been repeatedly bullied and attacked over the course of a year. *Id.* #19, 23, 25–31, 34, 40. No one conducted a re-assessment or re-classification based on these events. *Id.* #19, 23, 25, 29, 40; *see also id.* #11–12, 27. Instead, Harvey approved re-assessments and re-classifications that did *not* document any of these incidents or Plaintiff's disability. *Id.* #27–28. Allen, Vasquez, Knight, and Harvey were all aware that they had the authority to recommend to ICE that Plaintiff be transferred to a more suitable facility but did not ever do so. *Id.* #33–34. Beyond issuing bed changes and separation orders *after* bullying and assaults, GEO did nothing more to protect Plaintiff after repeated harassment and assault and with knowledge that he had a cognitive disability that put him at risk of victimization. *Id.* #27–29, 35, 40.

In May 2022, one of the detained individuals who had been sexually harassing Plaintiff in D dorm anally raped Plaintiff in the shower of D dorm. *Id.* #36. Plaintiff was hospitalized. *Id.* GEO conducted a PREA investigation and found that the allegation was substantiated. *Id.* #37. After the PREA investigation was completed, Knight and Harvey completed ICE's mandatory sexual assault incident review form. *Id.* #38. In completing the form, Knight and Harvey erroneously stated that

1) Plaintiff had no disabilities, 2) GEO staff response was timely, 3) no group dynamics motivated the assault, 4) nothing could have prevented or detected this issue, and 5) there was no retaliation. *Id.* #39.

During the time that Plaintiff was at MVIPC, GEO violated the PBNDS, DHS PREA regulations, the Rehabilitation Act, and its own policies repeatedly in failing to protect Plaintiff, a vulnerable, cognitively disabled individual who was repeatedly bullied, harassed and assaulted. *Id.* #40–41. Particularly with respect to Plaintiff's cognitive disability, GEO failed to protect him and abide by its own requirements. GEO never recorded, flagged, or tracked that Plaintiff had a cognitive disability that put him at risk of victimization. *Id.* #40. It failed to respond to mounting evidence that Plaintiff was in fact vulnerable to attack. *Id.* #25, 29–30, 40. GEO never flagged, referred, or discussed Plaintiff before its multidisciplinary committee for individuals with disabilities. *Id.* #42. GEO never considered Plaintiff's cognitive disability in deciding how it could prevent future attacks. *Id.* #30. In fact, GEO was not aware of *any* accommodation that it provided to Plaintiff based on his cognitive disability. *Id.* #44. And GEO never recommended to ICE that it transfer Plaintiff to a more suitable facility, despite having the power to do so. *Id.* #33–34. Instead, GEO left Plaintiff vulnerable to attack, in violation of its own policies.

## III. <u>LEGAL STANDARD</u>

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could affect the outcome of the suit under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if a reasonable jury could return a verdict for the nonmoving party. *See Brothers Market LLC No. 2 v. United States*, 172 F.4th 758, 766 (9th Cir. 2026).

Where, as here, the defendant is the moving party and will not bear the burden of proof at trial, the defendant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Sluimer v. Verity, Inc.*, 606 F.3d 584, 586 (9th Cir. 2010) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Critically, this burden is not a light one. The moving party

must affirmatively show that the nonmoving party lacks evidence on an essential element of her claim. *Celotex*, 477 U.S. at 325. A moving party cannot discharge its burden merely by submitting a motion that asserts the opposing party has no evidence; rather, the defendant must identify specifically those parts of the record that it believes demonstrate the absence of a genuine dispute. *Id.* at 323. Next, "the non-moving party must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial." *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1153 (9th Cir. 2009) (internal citations and quotations omitted).

In ruling on a motion for summary judgment, the court must view all facts and draw all reasonable inferences in favor of the non-moving party. *Bernal v. Sacramento Cnty. Sheriff's Dep't*, 73 F.4th 678, 695 (9th Cir. 2023) (citing *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (per curiam)). The court may not make credibility determinations, weigh the evidence, or resolve genuine factual disputes—those are exclusively functions of the jury. *Anderson*, 477 U.S. at 255.

## IV. ARGUMENT

### a. Cal. Gov. Code § 7320 Applies to Pre-Passage Conduct.

GEO argues that, for purposes of Plaintiff's claim under Cal. Gov. Code § 7320, the jury should not be permitted to consider GEO's conduct prior to January 1, 2021, the effective date of § 7320. As an initial matter, the Court need not resolve this argument on summary judgment because GEO does not seek summary adjudication of any claim or any part of a claim as part of its § 7320 argument. Rule 56 authorizes judgment only on "each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). GEO does not contend that excluding its pre-January 1, 2021, conduct defeats Plaintiff's § 7320 claim, and it does not seek to exclude that conduct as to any of Plaintiff's other claims. Its request, therefore, would not result in the entry of judgment on any claim or any portion of a claim. What GEO actually seeks is an order limiting the evidence the jury may consider in adjudicating a claim that GEO concedes will proceed to trial—relief that is properly raised, if at all, through a motion in limine and the jury instructions under Rule 51, not through summary judgment under Rule 56.

But even if the Court evaluates GEO's argument, it is incorrect. Cal. Gov. Code § 7320 imposes no new substantive obligations on private detention facility operators. It is accordingly best read as a statute that applies "prospectively," rather than a statute for which consideration of pre-2021 conduct would function as a prohibited "retroactive" application.

While, as GEO notes, California courts impose a presumption against retroactivity, "[w]hether a statute has 'prospective' or 'retroactive' effect is not easily determined." *USS-Posco Indus. v. Case*, 244 Cal. App. 4th 197, 217 (2016). "Courts are to consider the nature and extent of the change the statute brings about, and the relationship between the new rule of law and the relevant past events subject to the rule. They are also to take into account fair notice to, reasonable reliance by, and settled expectations of, those subject to the new rule." *Id.* "If preexisting rights or obligations are substantially affected, then application of a statute to preenactment conduct is retroactive and forbidden, absent an express legislative intent to permit such retroactive application. If preexisting rights are not so affected, then application of a statute to preenactment conduct is prospective and therefore permitted." *Id*.

As relevant to this litigation, § 7320 has two operative provisions. Section 7320(a) provides: "Any private detention facility operator shall comply with, and adhere to, the detention standards of care and confinement agreed upon in the facility's contract for operations." This provision, on its own, simply requires that private detention facility operators fulfill *pre-existing* contractual and/or regulatory obligations that they have voluntarily undertaken.

Section 7320(c) explains how subsection (a) affects litigation. It provides: "If a private detention facility operator, or agent of a private detention facility, or person acting on behalf of a detention facility operator, **commits a tortious action which violates subdivision (a)**, an individual who has been injured by that tortious action may bring a civil action for relief. In civil actions brought pursuant to this section, the court, in its discretion, may award the prevailing plaintiff reasonable attorney's fees and costs, including expert witness fees." Cal. Gov. Code § 7320(c) (emphasis added). The statute, in turn, defines a "tortious action" as "any act or willful

misconduct that violates a duty of care, as specified in Section 1714 of the Civil Code." Cal. Gov. Code § 7320(b)(5).

Thus, before § 7320 kicks in, § 7320(c) requires "an act or willful misconduct that violates a duty of care, as specified in Section 1714 of the Civil Code." Section 1714, which has been in effect since 1872, provides the statutory basis for claims of willful acts and negligence. Cal. Civ. Code § 1714(a) ("Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person[.]"). Once such an act has occurred, § 7320(c) asks whether that act *also* "violates subdivision (a)," which requires private detention facility operators to comply with the standards of care they agreed to in their contracts for operations. If it is determined that the "tortious act" *also* violates subdivision (a), then a person injured by the tortious act "may bring a civil action for relief" in which the court "may award the prevailing plaintiff reasonable attorney's fees and costs, including expert witness fees." Cal. Gov. Code. § 7320(c).

Thus, the main function of § 7320 is to create a fee-and-cost-shifting framework for a subset of duty-of-care breaches that also amount to violations of contractual detention standards. Because § 7320 requires a "tortious act" that breaches Cal. Civ. Code § 1714 before it has any functional effect, it does not create any significant new substantive liability. It instead creates discretionary fee-and-cost-shifting where breaches of the duty of care also amount to breaches of contractual detention standards. And California courts are clear that fee-shifting provisions are inherently "prospective" in nature and apply even where the conduct forming the basis of the suit pre-dates passage of the statute. *See, e.g.*, *Woodland Hills Residents Assn., Inc. v. City Council*, 23 Cal. 3d 917, 932 (1979) (applying newly enacted fee-shifting statute to cases pending at time of enactment); *Dragones v. Calkins*, 98 Cal. App. 5th 1075, 1083 (2024) ("Since *Woodland Hills*, California courts have consistently held that 'statutory provisions that alter the recovery of attorney fees are deemed procedural in nature and apply to pending litigation.'"); *USS-Posco*, 244 Cal. App. 4th at 221 ("[T]he California Supreme Court and many, many Courts of Appeal have treated legislation affecting the recovery of costs, including attorney fees, as addressing a 'procedural'

matter that is 'prospective' in character and thus not at odds with the general presumption against retroactivity.").

GEO may respond that § 7320(a)'s requirement that operators comply with contractual detention standards represents an expansion of the duty of care that alters GEO's substantive obligations. It is true that § 7320(a) clarifies that private detention facility operators owe a duty to comply with contractual detention standards. But this clarification is not an expansion of GEO's substantive obligations—§ 7320(a) only imposes a duty for GEO to follow rules that it is already required to follow. GEO's obligations are not "substantially affected" by a law requiring it to comply with statutory and regulatory standards to which it has already bound itself in lucrative government contracts. *USS-Posco*, 244 Cal. App. 4th at 217. Certainly, GEO will not and cannot argue that it was free to breach the PBNDS, PREA, and the Rehabilitation Act prior to passage of § 7320. *See* Undisputed Facts #31; Def.'s Ans. ¶¶ 8–10, ECF No. 10. There is nothing GEO is legally required to do after the passage of § 7320 that it was not already required to do before passage.

Moreover, § 7320 occasioned no substantial change in GEO's obligations because federal detention standards already imposed duties on GEO to its detainees prior to passage of § 7320. Regulatory requirements—like the PBNDS or DHS PREA regulations to which GEO bound itself—and statutory obligations—like the Rehabilitation Act—could form the basis of the standard of care well before the passage of § 7320. *See, e.g.*, Cal. Evid. Code 669 ("The failure of a person to exercise due care is presumed if . . . [h]e violated a statute, ordinance, or regulation of a public entity."). Even prior to § 7320, requirements like PBNDS formed the basis for the standard of care where the plaintiff is "one of the class of persons for whose protection the . . . regulations were adopted." *See, e.g.*, *Norman v. Life Care Centers of Am., Inc.*, 107 Cal. App. 4th 1233, 1247 (2003). Plaintiff—a profoundly developmentally disabled man who was sexually harassed and assaulted on more than one occasion at a GEO facility—is certainly among the "class of persons" for whose protection PBNDS provisions and DHS PREA regulations aimed at disability accommodation and sexual assault and abuse prevention, and the Rehabilitation Act were directed.

Section 7320(a)'s specification that private detention facility operators owe a duty to comply with detention standards accordingly did not represent a shift in GEO's duties to its detainees.

Thus, the only meaningful change occasioned by § 7320 is subsection (c)'s fee-and-cost-shifting provision. Because such provisions are considered prospective and not retroactive, even when applied to pre-passage conduct, the Court should reject GEO's argument.

**b. <u>Plaintiff Has Established a Triable Issue of Material Fact as to his Claim for Punitive Damages.</u>**

GEO next argues that Plaintiff should not be permitted to recover punitive damages because he has not adduced sufficient evidence under Cal. Civ. Code § 3294. Under that provision, punitive damages may be awarded "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a). Where the defendant is a corporation, "the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." *Id.* § 3294(b). A "managing agent" is an employee who "exercise[s] substantial discretionary authority over significant aspects of a corporation's business." *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 577 (1999). "Corporate ratification in the punitive damages context requires actual knowledge of the conduct and its outrageous nature." *Civil Rights Dept. v. Grimmway Enter., Inc.*, 800 F. Supp. 3d 1084, 1120 (E.D. Cal. 2025) (quoting *Coll. Hosp. Inc. v. Superior Ct.*, 8 Cal. 4th 704, 726 (1994), *as modified* (Nov. 23, 1994)).

As an initial matter, Plaintiff notes that while § 3294 provides one avenue for Plaintiff to recover punitive damages on his negligence and § 7320 claims, it is not the only path: Plaintiff may also recover punitive treble damages if he is successful on his Unruh Act claim. Cal. Civ. Code § 52(a); *C.O. v. Cnty. of Kern*, 2022 WL 286544, at *6 (E.D. Cal. Jan. 31, 2022) ("[T]reble damages under Section 52(a) bear 'hallmarks of punitive damages'" (quoting *Archibald v. Cnty. of San Bernardino*, 2018 WL 8949779, at *1 (C.D. Cal. May 10, 2018))); *Botosan v. Fitzhugh*, 13 F. Supp. 2d 1047, 1052 (S.D. Cal. 1998); *see Harris v. Capital Growth Investors XIV*, 52 Cal. 3d 1142, 1172 (1991), *superseded by statute on other grounds in Munson v. Del Taco, Inc.*, 46 Cal.

4th 661, 690 (2009) (holding § 52(a) reveals a desire to punish "intentional and morally offensive conduct"). Treble damages may be awarded under the Unruh Act simply upon finding of a violation, without the showing required under § 3294. Cal. Civ. Code § 52(a) (stating anyone who violates the Unruh Act "is liable for . . . any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage"); *see Midpeninsula Citizens for Fair Housing v. Westwood Invs.*, 221 Cal. App. 3d 1377, 1392 (1990) ("Under the Unruh Act, a person denied the rights provided by section 51 can recover treble damages and attorneys' fees."). GEO rightly does not argue in its summary judgment motion that Plaintiff may not recover treble damages under the Unruh Act, nor does it challenge Plaintiff's Unruh Act claim on summary judgment. Accordingly, even if the Court finds GEO's § 3294 argument persuasive (it is not), Plaintiff will still have punitive treble damages available on his Unruh Act claim at trial.

Regardless, GEO is not entitled to summary judgment on Plaintiff's § 3294 punitive damages claims because GEO fails to meet its initial burden of production and because multiple triable issues of fact remain. Plaintiff need not prove a case for punitive damages under the "clear and convincing" evidentiary standard at summary judgment. *Civil Rights Dept. v. Grimmway Enter., Inc.*, 800 F. Supp. 3d 1084, 1120 (E.D. Cal. 2025) (citing *Spinks v. Equity Residential Briarwood Apartments*, 171 Cal. App. 4th 1004, 1053 (2009)). Rather, GEO, as the moving party, has "both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (citing 10A Charles Alan Wright, Arther R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2727 (3d ed. 1998)). To carry its burden of production, GEO "must either produce evidence negating an essential element of [Plaintiff's] claim . . . or show that [Plaintiff] does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id.* Where GEO has failed to carry its initial burden of production, Plaintiff "has no obligation to produce anything," even where he has the ultimate burden of persuasion at trial, and "may defeat the motion for summary judgment without producing anything." *Id.* at 1102–03.

GEO has failed to present evidence meeting its initial burden of production. In GEO's motion, all statements relating to the authority of individual GEO employees are supported only by James Janecka's declaration. *See* Mtn. at 12–13; *see also* Undisputed Facts #10–20, 28. Plaintiff has filed concurrently a motion to strike Mr. Janecka's declaration because Defendant never disclosed him as a potential witness in its disclosures. ECF No. 89.[2] Without these statements, the only facts that GEO has put forth in its motion are that GEO conducts internal and external audits and inspections, repeated violations of corporate policy are considered unacceptable by GEO, and that no PREA-related deficiencies were documented during any audit or inspection between 2021 and 2022. Mtn. at 12–13. These facts, standing alone, do not establish a prima facie showing of the nonexistence of any triable material fact.

Beyond these facts, GEO relies only on conclusory statements that there is "no genuine dispute of material fact evidence that any of its Corporate officers, directors, or any of its managing agents, knew and consciously disregarded, authorized, or ratified any act of oppression, fraud, or malice or personally committed any such act in this case." Mtn. at 13. In fact, there remain genuinely disputed material facts with regards to Plaintiff's punitive damages claim, both as to whether a "managing agent" ratified the conduct, and whether the conduct supports an award of punitive damages. Plaintiff should be able to present these facts to a jury.

First, there remains a triable issue as to whether a "managing" agent ratified the conduct at issue in this case because the MVIPC facility administrators, chief of security, and PSA Compliance Manager all had discretion sufficient to establish roles as "managing" agents. "The scope of a corporate employee's discretion and authority under [§ 3294(b)'s managing-agent] test is therefore a *question of fact* for decision on a case-by-case basis," *White*, 21 Cal. 4th at 577, that,

---

[2] In addition to the fact that the declaration is inadmissible, Janecka's statements also "cannot satisfy [GEO's] initial burden of production of *evidence*" because they merely "state[] a legal conclusion by simply parroting the *White* standard." *Davis*, 220 Cal. App. 4th at 369 (holding defendant failed to establish prima facie showing of triable issue regarding whether employee was a managing agent by relying solely on employee's declaration stating he never "had substantial discretionary authority over decisions that ultimately determine [Defendant's] corporate policy"); *see* Janecka Decl. ¶ 6 ("No employee working at an individual GEO facility has any decision-making authority to determine overall corporate policy.").

if there is a triable issue, "must be determined by the trier of fact and not the court on a motion for summary adjudication," *Davis*, 220 Cal. App. 4th at 366. An "employee's hierarchy in a corporation is not necessarily determinative of his or her status as a managing agent of a corporation." *Id.* at 370. Rather, "an employee's hierarchy and job duties, responsibilities, and authority may be sufficient, absent conclusive proof to the contrary, to support a reasonable inference by a trier of fact that the employee is a managing agent of a corporation." *Id.* The "critical inquiry is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy." *Nargizyan v. State Farm Gen. Ins. Co.*, 120 Cal. App. 5th 581, 605 (2026) (quoting *Egan v. Mt. of Omaha Ins. Co.*, 24 Cal. 3d 809, 822–23 (1979)). Employees who "exercise broad discretion" in making decisions resulting in "the ad hoc formulation of policy" are also "managing agents" for punitive damages purposes. *See Egan*, 24 Cal. 3d at 823 (holding that authority vested in claims manager and claims adjuster was sufficient because they "exercised broad discretion in the disposition of" claims, "necessarily result[ing] in the ad hoc formulation of policy"); *Nargizyan*, 120 Cal. App. 5th at 606 (finding triable issue where employee "had supervisory authority to grant or deny coverage of claims," "worked on or overseen thousands of claims," and ensured subordinates "comply with [defendant's] standard claims processes and apply the guidelines set forth in [defendant's] claim-handling Operation Guide"); *see also Hobbs v. Bateman Eichler, Hill Richards, Inc.*, 164 Cal. App. 3d 174, 193 (1985) (finding substantial evidence that office manager of single branch office was managing agent because he supervised trades made for clients, supervised all accounts at office, and in general was in charge of compliance).

The various facility administrators, the chief of security, Michael Knight, and the PSA Compliance Manager, Catherine Harvey, at MVIPC were all employees of GEO who had broad discretion in making decisions that ultimately determined corporate policy, both ad hoc and otherwise. GEO confirmed that Nathan Allen and Norbal Vasquez, both facility administrators, Knight, chief of security and acting facility administrator, and Harvey, programs manager, were individuals with responsibility for the final determination of classification and housing

assignments for individuals detained at MVIPC. Pl.'s Disputed Facts #1. As (acting) facility administrators, Allen, Vasquez, and Knight all oversaw and managed MVIPC, ensuring contract and policy administration and compliance, overseeing operations and personnel, and ultimately controlling daily operation and decision making at MVIPC. *Id.* #2–3; *see Davis*, 220 Cal. App. 4th at 370; *Nargizyan*, 120 Cal. App. 5th at 606. And as PSA Compliance Manager, Harvey had "duties and responsibilities to enforce" GEO's PREA policies, "administering [GEO's] policies that prevent discrimination, retaliation, and harassment" under PREA, "conducted training for staff employees," "took and responded to [detainee] complaints" relating to PREA, "and conducted or oversaw investigations . . . including alleged discrimination, retaliation and/or harassment" under PREA. *Davis*, 220 Cal. App. 4th at 372–73; *see Nargizyan*, 120 Cal. App. 5th at 606; *see* Pl.'s Disputed Facts #4. Harvey created the SAAPI At-Risk Log for MVIPC and had the authority to decide to what characteristics MVIPC would track – including, as relevant here, the decision *not* to track individuals who had diagnosed disabilities that put them at higher risk of victimization. Pl.'s Disputed Facts #5–6. For these reasons, under California law, there is a triable issue as to whether Allen, Vasquez, Knight, and Harvey were managing agents under § 3294(b).

Additionally, there is a triable issue as to whether GEO's conduct constituted "the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice," because the managing agents had both advance knowledge and acted with conscious disregard and ratification of acts of oppression and malice. Cal. Civ. Code § 3294(b). "[I]n the usual case, the question of whether the defendant's conduct will support an award of punitive damages is for the trier for fact, since the degree of punishment depends on the peculiar circumstances of each case." *Civil Rights Dept.*, 800 F. Supp. 3d at 1121 (quoting *Spinks*, 171 Cal. App. 4th at 453). Plaintiff should be able to present these facts to a jury to determine whether GEO's conduct rises to the level of malice, and the extent of Plaintiff's entitlement to punitive damages. *See Civil Rights Dept.*, 800 F. Supp. 3d at 1122 (review of files by managing agent could be interpreted by factfinder as actual knowledge and ratification of systematic violations, "typical case" denying summary judgment); *Doe 1 v. United Airlines, Inc.*, 2021 WL 4595766, at *6 (C.D.

Cal. Apr. 22, 2021) (failure to implement procedures to respond to sexual assaults on flight in light of known risk of sexual assault sufficiently pled malice); *Walashek v. Air & Liquid Sys. Corp.*, 2016 WL 4197960, at *9 (S.D. Cal. May 16, 2016) (reasonable jury could find that failure to take measures to protect safety of workers despite knowledge of potential harm from asbestos exposure was malicious).

The evidence presented with this opposition shows that Allen, Vasquez, Knight, and Harvey had actual knowledge of "willful and conscious disregard" of Plaintiff's rights. *Civil Rights Dept.*, 800 F. Supp. 3d at 1121 (citing Cal. Civ. Code § 3294(c)(1)). All four individuals knew that Plaintiff had a cognitive disability. Pl.'s Disputed Facts #8. Yet, no one flagged or labeled Plaintiff as at risk of victimization based on either his cognitive or hearing disability. *Id.* #6, 9, 11–12, 40. They did not ensure that any security staff working directly with Plaintiff on a daily basis knew about Plaintiff's cognitive disability or his vulnerability to sexual assault. *Id.* #9. They also approved PREA assessment and reassessment, and classification and re-classification forms that erroneously omitted his cognitive and hearing disabilities and labeled him as *not* at risk of sexual victimization for *years*. *Id.* #11–12, 27–28. Instead of protecting Plaintiff as someone who, by MVIPC and GEO's own metrics, was at high risk of sexual victimization, the managing agents of MVIPC housed Plaintiff with the detainees who had the most serious criminal histories without any safeguards beyond assigning him to a bed near the officer's podium. *Id.* #13, 40.

The managing agents also failed to do anything meaningful to protect Plaintiff after learning about repeated incidents that threatened Plaintiff's safety throughout the time Plaintiff was at MVIPC. *Id.* #25. These reports escalated to a finding by the MVIPC psychiatrist, Dr. Mike Ahmadshahi, that Plaintiff was not recommended for general population because of his disability and a request by Dr. Ahmadshahi in December 2020 that Plaintiff be moved and protected after bullying in his dorm because of his cognitive disability. *Id.* #14. Allen, Knight, and Harvey were all notified of Dr. Ahmadshahi's request and, in particular, Allen and Knight were notified that Plaintiff was being bullied because of his "low mental capacity." *Id.* #15–16. MVIPC staff moved Plaintiff to another dorm, but he continued to endure bullying, which the managing agents were

notified about. *Id.* #20. In August 2021, the managing agents were notified that another detainee beat Plaintiff severely enough to require hospitalization. *Id.* #21. In November 2021, another detainee tried to assault Plaintiff again because of his prior criminal conviction – an explicit vulnerability MVIPC policy requires flagging, but that MVIPC never properly did, even after the managing agents were notified of this incident. *Id.* #22–23. There is also evidence showing that Plaintiff was repeatedly bullied and sexually harassed in his dorm in the time leading up to the May 2022 sexual assault, and that the managing agents knew about it, but failed to act. *Id.* #24.

Despite knowing about this repeated pattern of assaults, harassment, and bullying, the managing agents did not take action to protect Plaintiff. *Id.* #25. No one investigated who was bullying Plaintiff in December 2020, and no one determined whether it was safe to transfer Plaintiff back into that dorm in August 2021. *Id.* #26. No one conducted reclassifications or PREA re-assessments in response to these attacks. *Id.* #19. Instead, Harvey repeatedly approved PREA re-assessments and reclassifications that obviously did not denote that Plaintiff had disabilities and had been both beaten up and threatened, despite the forms requiring such information. *Id.* #27–28. In fact, GEO admitted that it was unaware of anyone at MVIPC ever flagging Plaintiff as having been repeatedly bullied and harassed or ever considering Plaintiff's cognitive disability in deciding how to protect him from future attacks. *Id.* #29–30, 44. No one tried housing Plaintiff in a dorm by himself, even though MVIPC had previously done so for others. *Id.* #31–32. Despite knowing that they had the authority to recommend to ICE that Plaintiff be transferred to a more suitable facility, these managing agents did not do so. *Id.* #33–34. Instead, the managing agents did nothing more than sign off on their subordinates' decisions to move Plaintiff's bed assignment around and, in the case of the detainee who assaulted Plaintiff in August 2021, issue a separation order. *Id.* #35, 43–44. Despite this known pattern of abuse and Plaintiff's vulnerabilities, after Plaintiff was raped by another detainee in May 2022, Knight and Harvey filled out ICE's mandatory incident review form in a manner that omitted all information that would imply wrongdoing, expressly stating that Plaintiff had no disabilities, staff response was timely, no group dynamics motivated the assault, and nothing could have prevented or detected this issue. *Id.* #36, 38–39. These facts support a

finding that the managing agents at MVIPC were aware of and ratified GEO's systematic failure to protect Plaintiff. *See Civil Rights Dept.*, 800 F. Supp. 3d at 1122. And GEO does not dispute that whether such a systematic failure to protect Plaintiff constitutes "willful and conscious disregard" of Plaintiff's rights sufficient to establish malice is a disputed fact that must be left for the fact finder to decide – nor could they, in this "typical case" involving disputed facts. *See* Mtn. at 12–13; *Civil Rights Dept.*, 800 F. Supp. 3d at 1122.

Separate and apart from GEO's liability for punitive damages based on the conduct of its managing agents, it also is liable because of its "blatant violation of law or policy." *Am. Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton*, 96 Cal. App. 4th 1017, 1051 (2002). Here, GEO was violating PBNDS, PREA, its own policies, and the Rehabilitation Act. Pl.'s Disputed Facts #40–41. GEO repeatedly and obviously failed to accurately record Plaintiff's vulnerabilities in their own screenings, in violation of their own policies, for the years that Plaintiff was at MVIPC until *after* he was raped: *no one* properly recorded that Plaintiff had a cognitive and hearing disability, *no one* properly noted that he was at higher risk of victimization because of his prior criminal history, and *no one* ever notated the numerous incidents of bullying, harassment, and assault that Plaintiff endured throughout his time at MVIPC. *Id.* GEO admitted this was a violation of GEO policy and procedures. *Id.* No one flagged Plaintiff as at risk for victimization in *any* way, either through the At-Risk logs or otherwise. *Id.* #6, 9, 11–12, 27–29, 40.

GEO also failed to provide accommodations for Plaintiff's disabilities in violation of the PBNDS and the Rehabilitation Act. GEO never flagged or discussed Plaintiff before their multidisciplinary committee for individuals with cognitive disabilities. *Id.* #42. He was provided almost no accommodations for his cognitive disabilities: he was often forced to ask other detained individuals to write grievances and requests for him, and GEO admitted that the only accommodations they would give someone with a cognitive disability at MVIPC was to read them documents at intake and place them in a bed near the podium, which is also in camera view. *Id.* #42–44, 48. GEO's conscious disregard of these standards that caused Plaintiff to be repeatedly harassed and assaulted, leading to a brutal rape, rises to the level of oppression and malice under

Cal. Civ. Code § 3294. *See Hughes v. Blue Cross of N. California*, 215 Cal. App. 3d 832 (1989) (holding where defendants' conduct was "all rooted in established company practice," this was "sufficient to support a finding that the [practice of denying health care coverage] operated in conscious disregard of the [plaintiff's] rights"); *Romo v. Ford Motor Co.*, 99 Cal. App. 4th 1115, 1141 (2002), *vacated and remanded on other grounds*, 538 U.S. 1028 (2003) (malice established where evidence supports an inference that a corporate policy itself disregards a known risk).

## V. **CONCLUSION**

For the reasons stated, Plaintiff respectfully asks that the Court deny GEO's Motion for Partial Summary Adjudication.

Respectfully submitted,

Date: June 30, 2026

BY: Romanucci & Blandin

s/Maura D. White
Maura D. White*
Benjamin Berkman*

IMMIGRANT LEGAL DEFENSE
Jessica Zhang*
Claudia Valenzuela*

*Attorneys for Plaintiff L.V.Q.*

**Admitted pro hac vice*